**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JEROME SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 12 C 05116 |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN,[1] Acting | ) | Judge John J. Tharp, Jr. |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Jerome Smith seeks judicial review of the Commissioner of Social Security's determination that he is not disabled and is therefore ineligible to receive Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Now before the Court is Smith's motion for summary judgment. Dkt. 12. For the following reasons, the Court grants Smith's motion and remands for further proceedings consistent with this Opinion.

**I.    Background**

**A.  Factual and Procedural Background**

Smith was born on August 27, 1951. He is a high school graduate and studied accounting at college for approximately one year. R. 32.[2] He stopped working as a truck dispatcher in 2007 upon being laid off, after which he reports being unable to find other work. R. 32–33, 219. At the time of the administrative hearing in this case, Smith lived in a recovery home for alcoholics and

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d)(1), Carolyn W. Colvin, who became the Acting Commissioner of Social Security on February 14, 2013, is substituted for Commissioner Michael J. Astrue as defendant.

[2] Citations to R. refer to pages in the administrative record, which was filed as Dkt. 8.

other people. R. 34–35. He maintains that since December 2009, he has been disabled due to limitations related to his diabetes, diabetic neuropathy, high cholesterol, depression, anxiety, shortness of breath, pain, obesity, the side effects of his medications, and other ailments.

On March 17, 2010, Smith filed an application for SSI with the Social Security Administration. On April 23, 2010, he filed for DIB. In both applications, Smith alleged disability beginning December 1, 2009. His date last insured was March 12, 2013. His applications were denied initially and upon reconsideration. Smith requested and received a hearing before an administrative law judge ("ALJ"), at which Smith (who was represented by counsel) and a vocational expert testified. R. 29–67. After the administrative hearing, the ALJ denied Smith's claim on the ground that he is not disabled. R. 10–20. The Social Security Council subsequently denied Smith's request for review, leaving the ALJ's decision as the final decision of the Commissioner. R. 1–5; *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). Smith now seeks review of that decision pursuant to 42 U.S.C. § 405(g).

### B. Medical Evidence

Smith has seen several doctors and takes multiple medications to treat his ailments. Smith is overweight or obese: He is five-foot-seven and has weighed between 185 and 203 pounds. R. 36, 218. He takes medications for high blood pressure, diabetes, high cholesterol, acid reflux, and depression. R. 222, 261. Between 2008 and 2010, Smith was treated at the Vista Health Center. R. 321–56. These records are mostly handwritten and difficult to decipher, but appear to be primarily related to physical impairments such as diabetic neuropathy, pain, and high blood pressure; they also include diagnoses of alcohol abuse and anxiety. R. 332, 334–35, 338–39.

Smith's most recent treatment has occurred primarily at the Oak Forest Hospital. R. 36. In April 2010, he was admitted to Oak Forest with abdominal pain and alcohol withdrawal

syndrome; records from this stay also note depression. R. 370, 373–74. In May 2010, Smith was seen at Oak Forest on an outpatient basis; records note that he had hypertension, depression, diabetes, and alcoholism and that he followed up with outpatient eye and diabetic foot exam appointments. R. 612–17. On July 21, 2010, Smith was again admitted to Oak Forest Hospital after going to the emergency room for epigastric chest pain that worsened with movement, coughing, and respiratory efforts. R. 475. Medical records from his stay indicate that he had been experiencing shortness of breath when lying down at night associated with palpitations and occasionally jerky movements. R. 477. Records also show that Smith had also been experiencing progressively decreasing capacity for exercise to the point where he experienced shortness of breath after walking one hundred feet. *Id.* While admitted, he received respiratory therapy. R. 419–69. A pulmonary function test showed a mild reduction in vital capacity and moderately reduced unadjusted DLCO (diffusing capacity); the technician's notes state, "Although $FEV_1$/FVC ratio does not exceed 95% confidence interval to formally call obstruction, it is nearly there." R. 643–47.[3] Social work case coordination notes indicate that he had a place to stay temporarily at a rented room with a friend, but that he had no income and wanted more permanent housing. R. 479. Smith was discharged on August 10, 2010. R. 477. On October 5, 2010, Smith returned to the Oak Forest emergency room, needing a medication refill. R. 629–30. The primary diagnosis listed on records from that visit is depression, with other diagnoses for diabetes and insomnia. R. 629. Smith returned to Oak Forest for follow-up appointments later that month, R. 638–39, for appointments related to his hypertension and diabetes in January 2011

---

[3] The results of this pulmonary function test had not been received by the ALJ at the time of the administrative hearing on March 2, 2011. Smith's attorney sent them to the ALJ on March 10, 2011.The ALJ declined to consider the results of the pulmonary function test in her opinion issued April 12, 2011, apparently unaware at that point that the records had already been sent.

and for psychiatric care and medication refills in December 2010 and February 2011, R. 622–25, 634–37, 640.

Dr. Herman Langner, a psychiatrist, met with and evaluated Smith for the Bureau of Disability Determination Services on June 16, 2010. R. 389–91. He diagnosed Smith as having generalized anxiety disorder and dysthymic disorder with a history of hypertension, high cholesterol, and diabetes, with a Global Assessment of Functioning ("GAF") score of 45. R. 391. Dr. Langner's records do not include a medical source statement, which is "a statement from a treating or examining physician that explains what a claimant can do despite [his] impairments." *Thomas v. Colvin*, No. 13-2602, 2014 WL 929150, at *4 (7th Cir. Mar. 11, 2014).[4]

Dr. Howard Tin, a medical consultant, completed a mental residual functional capacity assessment of Smith on July 13, 2010. R. 406–09. He concluded that Smith had moderate limitations in certain activities related to understanding and memory, sustained concentration and persistence, and social interaction, and that Smith was not significantly limited or showed no evidence of limitations in other activities. Dr. Tin noted that Smith is oriented, understands simple instructions, and claims to have a short attention span and various mental and physical problems. Dr. Tin opined that Smith "has difficulty carrying out detailed instructions and maintaining attention and concentration for extended periods of time," but "is capable of performing simple tasks." R. 408. He explained that Smith "has difficulty in interacting appropriately with the general public and admits that he is withdrawn and isolates himself, so limit work tasks that do not require interaction with the general public." *Id.* Finally, Dr. Tin

---

[4] Illinois does not require medical source statements, and the Seventh Circuit recently remarked that the "completeness of an administrative record is generally committed to the ALJ's discretion" and declined to require a medical source statement, "particularly considering that the determination of a claimant's RFC is a matter for the ALJ alone—not a treating or examining doctor—to decide." *Thomas*, 2014 WL 929150, at *4 (citing 20 C.F.R. § 404.1527(d)).

concluded that Smith "has the ability to respond appropriately to changes in work settings, being aware of normal hazards and travel in unfamiliar settings and set realistic goals." *Id.*

Dr. Calixto Aquino, a medical consultant, completed a physical residual functional capacity assessment of Smith on July 14, 2010. R. 410–17. The assessment notes a primary diagnosis of diabetes and a secondary diagnosis of hypertension. R. 410. Dr. Aquino concluded that Smith could occasionally lift fifty pounds and frequently lift twenty-five pounds; stand, walk, or sit with normal breaks for about six hours in an eight hour workday; and was not limited with regard to pushing or pulling, including operation of hand or foot controls. R. 411. Dr. Aquino noted no postural, manipulative, visual, communicative, or environmental limitations. R. 412–16. Dr. Aquino stated that Smith's "statements are partially credible in light of the overall evidence," explaining that his "medically determinable impairment can be expected to produce some limitations in function, but the extent of the limitations described by the claimant exceeds that supported by the objective medical findings cited above." R. 417. Finally, Dr. Aquino commented, "No MSS, so no controlling [weight] given." *Id.*

On November 1, 2010, Dr. Ernst Bone and Phyllis Brister, Ph.D., reviewed Smith's file on reconsideration of his initial denial and determined that the July 14 and June 16 residual functional capacity assessments could be affirmed. R. 619. The explanation on reconsideration stated that while Smith may have some hypertension, high cholesterol, and diabetes, these conditions are adequately controlled with medical management without "extremely debilitating limitations nor any end organ damage," therefore Smith's limitations are not sufficiently serious to be disabling. R. 620. Additionally, "while [Smith] alleges depression, compulsiveness, and nervousness, there is no indication of serious mental illness, but there is evidence of a history of heavy alcohol abuse." *Id.* The decision stated that "nothing has changed about this man's

condition since the time of the last decision and as such, it is now determined that both of the previous eforms as well as the previous determination can be affirmed" and described Smith as "partially credible in that not all of his subjective complaints and limitations are supported by the objective medical evidence currently in file." *Id.* The decision also noted, "No MSS and no controlling weight assigned." *Id.*

### C. The Administrative Hearing

At the March 2, 2011, administrative hearing, Smith was represented by attorney John Horn, who also represents him in this appeal. In response to the ALJ's first questions regarding the completeness of the record, Horn indicated that the medical records from Oak Forest Hospital did not include the results of a pulmonary function test that Smith had undergone. At that point, the ALJ agreed to hold the record open for one week and the hearing proceeded.[5]

Smith testified, answering the ALJ's initial questions about his background, education, and work history. In response to a question as to what his main health issue is, Smith stated:

> I've had hypertension or high blood pressure since I want to say 20 years ago or what have you but lately, I've got the cholesterol, the diabetes. I've been put on depression pills, the depression pill, Cymbalta and a couple of others. And I would say that is my main problem because that's causing some drowsiness now with what she's given me.

R. 34. He went on to explain that he thinks he is on "too many medications." *Id.* He listed their side effects as drowsiness and nausea. The ALJ asked whether he had any problems driving, and Smith replied, "No." R. 35. Smith then explained that he has drowsiness from his medications, but that had "never had it while [he] was driving" and in fact does not currently own a car. *Id.*

---

[5] Horn also pointed out that the records of the consultative examiner did not include a source statement. R. 31. He raised a constitutional argument related to this lack of source statement during the administrative review process, R. 299, but does not assert such a claim here.

Smith reported that he takes his medicine on the schedule that he is supposed to and that he exercises by walking a block or two and mostly follows the diet for his diabetes. R. 35–36.

In 2009 and the first half of 2010, Smith testified, he was drinking "anywhere from a case of beer, bottle of booze" per week, and that his drinking gradually worsened and interfered with his functioning. R. 37–38. In August 2010, Smith moved into the recovery home. He testified that he is sober there and that he has not relapsed or "fallen off the wagon" since moving in. R. 36. Since the time that he stopped drinking, Smith testified that his health and mind have improved somewhat, although he also testified that "It improved my mind somewhat, you know, the depression, it seems to have helped the depression in one sense but not in the other. To where I'm, you know, she's got me on anxiety pills and depression pills." R. 38. Smith also testified that his medications for depression and anxiety do not help him.

Each day from 8:00 a.m. until 5:00 p.m., Smith spends his time at the recovery home's auto clinic, where he performs tasks like dusting and answering phones. R. 39–40. The auto clinic sees about three or four customers in a day. R. 45. Smith's activities in a day at the auto clinic include a mixture of standing on his feet, setting behind a desk, and walking, though he sits most of the day. R. 45. When his attorney later asked him follow-up questions about his work at the auto clinic, Smith testified that he is required to spend eight hours a day there, but that he is not always working. He answers the phone and calls customers, but also spends time playing with the computer and doing other things. R. 53. He receives a bagged lunch and returns to a prepared dinner at the recovery home. There, he also cleans his room and does his own laundry. R. 40. When asked about his hobbies, Smith testified that he reads and watches television and is able to follow books and television shows. R. 42. Sometimes he shops across the street at Walgreen's, Dollar Store, or Ollie's. R. 41. When he goes to Oak Forest Hospital, Smith takes a

shuttle. He testified that he knows how to take the bus, including reading the schedule and going where he needs to go. R. 41. The ALJ asked him several different questions about his interactions with people, such as customers or other people in the auto clinic or people on the bus. Smith stated in response to these questions that he is able to generally be around people after explaining that he does not really face customers one-on-one and that he has never ridden that long on the bus. R. 42–43. He attends group meetings at the recovery house. R. 43.

Smith testified that he experiences pain, though not constantly. He reported feeling pain in his back, side, neck, and sometimes experiencing palpitations in his sleep when he rolls on his back. R. 43. He stated that he has shooting pains up his left side that come and go and are not triggered by anything in particular. He does not take pain medicine other than Ibuprofen when the pain persists, but he testified that the pain tends not to persist that long. R. 44. Smith estimated that he could carry ten to twenty pounds if he had to. He testified that long periods of time spent sitting "gets to" his back; within an hour, he moves from side to side, then gets up. If sitting for more than one hour to ninety minutes, he stated that he gets up and walks around, even if he is driving and needs to pull over. R. 45. As for his ability to walk, Smith testified that he is able to walk around a block for exercise; such an activity takes him about thirty minutes. He also estimated that he is able to stand for about one hour, and is able to use his hands. R. 46.

Smith testified that he smokes about one pack of cigarettes a day and that he sometimes has trouble breathing. R. 46. He used to take medicine for his breathing issues, but his prescription ran out and he has not gotten a new prescription filled; he testified that the prescription is "[p]robably in the drawer." R. 47. At the auto clinic, Smith stated that he is not exposed to fumes, dust, or chemicals because he is located in the back in a separate office. R. 47. At that point, the ALJ said that on the basis of Smith's testimony, she had sufficient evidence to

decide the case without delaying, and would not hold the record open for the results of Smith's pulmonary function tests. When Smith's attorney stated that his office was working on getting the records, the ALJ responded, "All right and if you can get it before the decision is issued, we'll certainly look at it." R. 48.

Smith's attorney asked him more questions after the ALJ finished. Smith testified about several visits to doctors, including on July 2010 visit to the Oak Forest Hospital during which he complained of palpitations and shortness of breath, for which he underwent pulmonary function tests. R. 49–50. He got an infection during that visit, which caused him to stay in the hospital for fourteen days. R. 50. Smith's attorney also asked him to describe his mental health issues. Smith testified that his anxiety has worsened with age. He described his anxiety:

> I don't know if it runs in the family. My parents both had high blood pressure, my brothers. But my cousin's wife calls it door disease [phonetic], every time we've got to go somewhere, everyone's got to use the bathroom, everyone's got to do this and that, coming here today I had to stop two, three times just because I've got this thing—I was sitting in the parking lot 7:30, what did you tell me yesterday, be here about 8:00, 8:15 is plenty. I just got to get there and I'm wore out when I get there. I'm like I'm beat.

R. 51–52. Describing his depression, Smith testified:

> That's where you're going the why me, you know. The depression, why did I do this, why did I do—why didn't I do that when I was younger, you know. I had the world by the rear end, let's say, I could have done anything I wanted. You know, why did I, why, why, why, you know.

R. 52. Smith went on to say that he was not sure if palpitations were the same as panic attacks. When asked, he stated that he did not know if his anxiety and depression led him to drink or if his drinking led to his anxiety and depression. He testified that he experiences decreased energy levels, has pain in his legs when he squats or bends, has problems kneeling, and gets cramps in his ankles when he sleeps. R. 53, 55. He further testified that he thought he could stand and walk

about two hours in an eight hour day, taking breaks, and that he would need to stretch for about five minutes after he sat for a prolonged period. R. 56–57.

Glee Ann Kehr, a vocational expert ("VE"), listened to the testimony and then testified about Smith's employment history and prospects. R. 58–64. VE testimony helps to determine whether a claimant's "work skills can be used in other work and the specific occupations in which they can be used." 20 C.F.R. § 404.1566(e). At a hearing, a VE may answer "a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work, either as the claimant actually performed it or as generally performed in the national economy." 20 C.F.R. § 404.1560(b)(2). Kehr testified that Smith's past work as a truck dispatcher is considered semi-skilled work classified as sedentary. R. 58.

The ALJ posed several hypothetical questions to Kehr regarding employment prospects for hypothetical individuals sharing Smith's age (59 years old), education (more than high school), and work history (semi-skilled). Kehr stated that a person of Smith's age, education, and work history who was limited to lifting or carrying fifty pounds occasionally and twenty-five pounds frequently, who has the concentration to perform simple tasks with normal breaks, who is not required to work in close proximity with others and is not required to interact with the general public more than occasionally could not perform Smith's past work. R. 59. When asked what types of jobs such an individual could perform, Kehr answered by listing the jobs of a store laborer who worked after hours and so would not have to answer questions (2,100 positions in the Chicago metropolitan area), a laundry worker (5,700 positions), and janitorial positions with some reductions based on the amount of interaction with others (2,600 positions). R. 60. In response to another hypothetical question by the ALJ, Kehr stated that a person who had these

limitations and also could not be exposed to concentrated fumes, dust, odors, gases, or poor ventilation would not be able to perform the job of laundry worker due to heat and humidity. R. 61. She further stated that if the person could not be exposed to concentrated fumes a few days a month, she would also exclude them from doing the work of a janitorial worker. R. 62. While the store laborer would experience intermittent dust, Kehr would not exclude such a person from that position. R. 62. Kehr also stated that such a person could do the job of an order picker, so long as it was not at a location working with higher volumes that would accumulate more odors, fumes, dust, and dirt (2,000 positions), and sorting jobs (2,200). R. 62–63. The ALJ posed a third hypothetical to Kehr: a person who can stand or walk for two hours, sit for six hours but would require a five-minute stretch every hour, lift twenty pounds occasionally and ten pounds frequently, and retains the concentration to perform simple tasks with normal breaks but who is not required to work in close proximity to others and is not required to interact with the general public more than occasionally. Kehr stated that such a person would be "at the grid,"[6] able to perform only unskilled, sedentary work with no transferable skills from Smith's former work as a truck dispatcher. Finally, in response to a question from Smith's attorney, Kehr stated that a person who has a 20% to 30% deficiency in concentration, persistence, and pace would be

---

[6] That is, such a person who was also Smith's age would be disabled when evaluated according to the "Grid," which refers to the medical vocational guidelines, comprised of tables appended to Social Security Administration regulations regarding disability benefits. *See* 20 C.F.R. pt. 404, subpt. P, app. 2. The tables are used at the last step of the ALJ's sequential analysis. *See* 20 C.F.R. § 416.969. They set forth various age, exertional limitations, and vocational factors and give the resulting decision (disabled or not disabled) for someone with those characteristics. 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(a). Where both exertional and nonexertional limitations exist, the Seventh Circuit has held that "the ALJ may not rely on the Grid to dictate a finding of disabled or not disabled; rather, an ALJ should consult a vocational source to determine whether nonexertional limitations change the conclusion suggested by the Grid." *Goffron v. Astrue*, 859 F. Supp. 2d 948, 961 (N.D. Ill. 2012) (collecting cases).

precluded from all competitive employment, regardless of exertional ability, because even "unskilled, simple" employment requires a person to be on task at least 85% of the time. R. 64.

Before the hearing concluded, Smith's attorney and the ALJ again discussed the missing pulmonary function test results. R. 65. The ALJ stated that if the results were received before the decision was issued, "that would be great." *Id.* But, the ALJ said that based on the testimony at the hearing, she thought she had enough evidence to rule without considering the test results and that she would be moving forward with the written decision. R. 65–66.

### D. The ALJ's Decision

The ALJ issued a decision that Smith was not disabled, and therefore denied his applications for DIB and SSI. To evaluate whether Smith was disabled and entitled to benefits, the ALJ followed the five-step sequential inquiry that is prescribed by Social Security regulations. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The five steps proceed as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity ("RFC") and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011) (quoting *Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008)); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "A finding of disability requires an affirmative answer at either step three or step five." *Briscoe v. Barnhart*, 425 F.3d

345, 352 (7th Cir. 2005). In each of the first four steps, the claimant bears the burden of proof. *Weatherbee*, 649 F.3d at 569 (citing *Briscoe*, 425 F.3d at 352). The government bears the burden at the final step and must present evidence establishing that the claimant's RFC, which is the most that the claimant can still do despite his limitations, enables him "to perform work that exists in a significant quantity in the national economy." *Id.* (citing 42 U.S.C. § 423(d)(2)(A); *Liskowitz v. Astrue*, 559 F.3d 736, 740 (7th Cir. 2009)); 20 C.F.R. §§ 404.1545(a), 416.945(a).

In this case, the ALJ determined at step one that Smith has not engaged in substantial gainful activity since December 1, 2009, his alleged disability onset date. At step two, the ALJ found that Smith has the following severe impairments: anxiety, depression, diabetes, high blood pressure, asthma, lung problems, obesity, and a history of alcohol abuse. At step three, the ALJ determined that Smith does not have an impairment that meets or medically equals one of the listed impairments that are conclusively disabling. In support of this finding, the ALJ explained that she considered the requirements for the respiratory, cardiovascular, and endocrine listings and found that the objective medical evidence did not establish impairments severe enough to meet or equal a listed impairment, whether considered separately or together. The ALJ noted that she gave great weight to the state agency psychiatrist's evaluation. R. 13. She explained that Smith has mild restriction in activities of daily living, moderate difficulties in social functioning, moderate difficulties with concentration, persistence, or pace, and had previously experienced two extended periods of decompensation.

Prior to step four, the ALJ determined that Smith has the residual functional capacity to perform medium work as defined in 20 C.F.R. §§ 404.1567(c), 416.967(c). According to the RFC, Smith can "sit and stand and/or walk for about 6 hours each in an eight-hour workday" and "retains the concentration to perform simple tasks with normal breaks where he is not required to

work in close proximity to others." R. 14. The ALJ found that Smith was limited in that he "should not be required to interact with the general public more than occasionally" and should have "no concentrated exposure to fumes, odors, dusts, gases, or poor ventilation." *Id.* In making this determination, the ALJ explained that she found Smith's testimony "not totally credible." R. 18. The ALJ gave the consultative psychiatrist's opinion little weight because it was inconsistent with the claimant's testimony regarding his interaction with the public; she gave the consultative doctor's opinion significant weight because it was consistent with the medical record.

Having made this determination of Smith's RFC, the ALJ concluded at steps four and five that while Smith is unable to perform his past work as a truck dispatcher, he is able to perform other work available in the national economy. R. 18–20. On that basis, the ALJ found that Smith is not disabled and is therefore ineligible for DIB and SSI. R. 10. The Appeals Council denied review, leaving the ALJ's decision as the final word of the Commissioner. *See Roddy*, 705 F.3d at 636. Smith now appeals the unfavorable decision.

## II.    Discussion

Under the Social Security Act, a person is eligible for disability benefits if he is insured for disability benefits, has not attained retirement age, has filed an application for disability insurance benefits, and suffers from a "disability." 42 U.S.C. § 423(a)(1). A disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). To be found disabled, the impairment or impairments must not only prevent the claimant from doing her previous work, but considering his age, education, and work experience, must also prevent him from engaging in any other type of

14

substantial gainful activity that exists in significant numbers in the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). A disabled person is eligible for SSI if they meet certain income requirements. 42 U.S.C. § 1382(a).

The Social Security Act authorizes district courts to "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The court reviews the Commissioner's legal determinations *de novo* and the Commissioner's factual findings deferentially. *See Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010); 42 U.S.C. § 405(g) (the Commissioner's factual findings are "conclusive" if supported by substantial evidence). The Commissioner's decision will therefore be upheld unless the findings are not supported by substantial evidence or the decision resulted from the application of an erroneous legal standard. *See Briscoe*, 425 F.3d at 351; *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt*, 395 F.3d at 744 (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)). The standard requires "more than a scintilla," but can be satisfied by "less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). However, a court "cannot uphold an administrative decision that fails to mention highly pertinent evidence." *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). A reviewing court must confine itself to the rationale offered by the ALJ and not new rationales offered on appeal. *See Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011).

A court reviewing the Commissioner's decision reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the Commissioner. *See Schmidt*,

395 F.3d at 744; *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2003). Nevertheless, the Court conducts a "critical review of the evidence" before affirming the Commissioner; "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (citing *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)); *see also Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009) (vacating and remanding where the ALJ mischaracterized the record). In addition to meeting these standards, the Commissioner must articulate enough detail and clarity in the analysis to allow a reviewing court to conduct meaningful appellate review. *Briscoe*, 425 F.3d at 351; *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001) (requiring the ALJ to "articulate at some minimal level her analysis of the evidence to permit an informed review"). The Commissioner is "not required to discuss every piece of evidence, but must build a logical bridge from evidence to conclusion." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) (citing *Steele*, 290 F.3d at 941). To build a logical bridge, an ALJ must "sufficiently articulate [her] assessment of the evidence to assure [the reviewing court] that [she] considered the important evidence . . . and to enable [the reviewing court] to trace the path of [her] reasoning." *Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999) (quoting *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996)) (internal quotation marks omitted). Smith challenges the ALJ's decision on two grounds: (1) errors in the assessment of his residual functional capacity ("RFC") and (2) errors in the assessment of his credibility.

Smith contends that the ALJ improperly assessed his RFC when she did not consider two pieces of evidence that did not support her RFC assessment: the opinion of the consultative mental examiner and the results of the pulmonary function test ("PFT"). R. 388–91, 642–47. Smith specifically argues that reversal or remand is required because the ALJ does not mention that the consultative medical examiner assessed Smith's Global Assessment of Functioning

("GAF") score to be 45. R. 391. The GAF Scale measures a patient's overall level of psychological, social, and occupational functioning, in most instances for the "current period" surrounding the date of examination. Am. Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32–33 (4th ed. text rev. 2000) (hereinafter, *DSM-IV-TR*). A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *DSM-IV-TR* 34. "[I]n situations where the individual's symptom severity and level of functioning are discordant, the final GAF rating always reflects the worse of the two." *DSM-IV-TR* 33. In light of this fact, the Seventh Circuit has reasoned that the GAF score "does not reflect the clinician's opinion of functional capacity." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (noting that "nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score"). Furthermore, the Commissioner of Social Security has stated that the GAF scale, while providing valuable additional functional information, "does not have a direct correlation to the severity requirements in [the Social Security Administration's] mental disorders listing." Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746, 50764–65 (Aug. 21, 2000). Smith thus overreaches when he characterizes his score as indicating that the examiner held the opinion that he "is incapable of all work." Br. 12, Dkt. 13.

Nevertheless, the ALJ must discuss conflicting evidence and has a duty to discuss potentially dispositive evidence. *See Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003) (citing *Stephens v. Heckler*, 766 F.2d 284, 288 (7th Cir. 1985). An ALJ may not "selectively discuss portions of a physician's report that support a finding of non-disability while

17

ignoring other portions that suggest a disability." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (citing *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009)).

The Commissioner is correct that in this case, the ALJ incorporated some of the findings of the consultative medical examiner in her decision. Yet the ALJ also affirmatively stated that "[t]he record does not contain any opinions from treating or examining physicians indicating that the claimant is disabled or even has limitations greater than those determined in this decision." R. 18. This comment, and the ALJ's responsibility to account for material, conflicting evidence, is problematic in the face of the low GAF score that the consultative examining physician assessed. The Seventh Circuit has previously stated that "[a] GAF rating of 50 does not represent functioning within normal limits. Nor does it support a conclusion that [a claimant] was mentally capable of sustaining work." *Campbell*, 627 F.3d at 307. While the Commissioner is correct that the ALJ did not ignore the examiner's report, the ALJ did not explain whether she considered Smith's even lower score of 45 or how she reasoned that Smith was able to sustain work despite this score. While an ALJ is not required to mention every piece of evidence, the record here is conflicting regarding the severity of Smith's mental symptoms, his limitations in interacting with others, and his limitations in his occupational functioning. The ALJ's failure to address the apparent conflict of her conclusion with Smith's GAF score was error in the context of this record. *See Campbell*, 627 F.3d at 309; *Walters v. Astrue*, 444 F. App'x 913, 919 (7th Cir. 2011). Without this explanation, this Court cannot be sure that the ALJ considered all of the evidence.

Additionally, the Social Security Administration's own regulations require ALJs to "explain the weight given to [state agency physicians'] opinions in their decisions." SSR 96-6p, 1996 WL 374180, at *1; *McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011). Here, Smith is correct in pointing out that the ALJ did not explain the weight given to the consultative medical

examiner's report, although she explained the weight given to the state agency psychiatrist and the state agency doctor. R. 18. This omission is also error that prevents this Court from determining whether the ALJ's decision is supported by substantial evidence.

Smith argues that, in light of these errors, reversal and award of benefits would be the proper remedy here; in the alternative, he asks that the matter be remanded. If the reviewing court finds that the Commissioner's decision is not supported by substantial evidence, "a remand for further proceedings is the appropriate remedy unless the evidence . . . compels an award of benefits." *Briscoe*, 425 F.3d at 355 (citing *Campbell v. Shalala*, 988 F.2d 741, 744 (7th Cir. 1993)). An award of benefits is only compelled "where all factual issues have been resolved and the record can yield but one supportable conclusion." *Id.* (quotation marks and citation omitted). Here, the record does not compel a finding of disability because the primary reason for reversal is the ALJ's failure to sufficiently explain her reasoning. Remand is therefore the appropriate remedy.

Remand is not warranted, however, if the administrative error is harmless. *See McKinzey*, 641 F.3d at 892 (citing *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010)). Whether error is harmless is a "prospective" question that requires a reviewing court to "look at the evidence in the record to see if [it] can predict with great confidence what the result on remand will be." *Id.* It is decidedly not "an exercise in rationalizing the ALJ's decision and substituting [the court's] own hypothetical explanations for the ALJ's inadequate articulation." *Id*; *see also Spiva*, 628 F.3d at 353 ("If it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support, then remanding is a waste of time."). While it is possible that an ALJ who considers all of the evidence in this case will reinstate the ALJ's

decision on remand, it is not fair to say that the decision is so overwhelmingly supported by the record that the Court can predict that result with great confidence. The ALJ might not have previously considered the GAF score and upon doing so, may change her overall assessment of Smith's residual functional capacity. Or, the ALJ might give more weight to the assessment once she is required to make her determination on that point explicit, especially in light of the fact that the score was given by a physician who directly examined Smith. *Cf.* 20 C.F.R. § 404.1527(c)(1) (noting that the Social Security Administration generally gives "more weight to the opinion of a source who has examined [a claimant] than to the opinion of a source who has not examined [the claimant]"). This might also lead her to change her assessment of Smith's limitations. The ALJ's failures here therefore cannot be said to be harmless. To be sure, this Court is not re-weighing evidence or concluding that finding of disability is warranted; it is only saying that the ALJ's decision, as it currently stands, fails to permit an informed review.

As for Smith's second argument regarding his RFC, there is no question that the ALJ did not consider the PFT results. The ALJ acknowledged that she declined to hold the record open for the PFT results and did not consider them. R. 10. The PFT results were submitted to the ALJ by Smith's attorney on March 10, 2011, well before the decision was issued on April 12, 2011. R. 20, 643. Given this Court's determination that remand is necessary for consideration of the consultative medical examiner's report, it is unnecessary to consider whether remand would be necessary for this particular omission standing alone. Still, an RFC is required to be "based on all the relevant evidence in [a claimant's] case record." 20 C.F.R. § 404.1545(a). In light of the fact that the ALJ must already redetermine Smith's RFC and Smith's argument that the PFT results support a sedentary finding, the ALJ should consider these results on remand. Similarly, nothing

precludes the ALJ from considering any other arguments raised in Smith's appeal and addressing those concerns on remand.

*    *    *

For the foregoing reasons, the Court grants Smith's motion for summary judgment in part, vacates the opinion below, and remands this matter to the Social Security Administration for further proceedings consistent with this Opinion.

Date: June 23, 2014

John J. Tharp, Jr.
United States District Judge